## Wilson v. Blanton.

[94 South. 214.　No. 22868.]

Evidence.　*Uncontradicted testimony must be taken as true.*
　Where a complainant testifies in his own behalf, and his testimony is not contradicted, either by direct testimony or by circumstances, and is not improbable in itself, it must be accepted as true, and, if it sustains the allegations of the bill, it is error to dismiss the bill and deny relief. *Stewart* v. *Coleman & Co.,* 120 Miss. 28, 81 So. 653, cited.

Appeal from Chancery court of Washington county.
Hon. E. N. Thomas, Chancellor.

Suit by A. E. Wilson against Sam Blanton. From an order dismissing the bill, plaintiff appeals. Reversed and remanded.

*Thompson & McWhorter,* for appellant.

Where the testimony of a witness is uncontradicted, either by positive testimony or circumstances, and is not inherently improbable, it cannot be rejected. *Kelly* v. *Jones,* 209 Ill. 375, 125 N. E. 334; *Newton* v. *Pope* (1823), 1 Cow. (N. Y.) 109; *Peters* v. *Wright* (1855), 6 Inc. 183; *Brown* v. *Peterson* (1905), 25 App. D. C. 359, 4 Ann. Cas. 980.

The chief testimony given in this case was by the complainant. Does this vary the rule? We say no. In our state an interested party is a competent witness. See section 1915, Code 1906, Hemingway's Code, section ――――. Again "Interested persons are by our law competent wit-

nesses, and their testimony is binding on the court, unless overcome by counter-testimony, or irreconcilable with the known facts of the case." *Marks* v. *New Orleans Cold Storage Co.* (1901), 107 La. 172, 57 L. R. A. 271, 90 Am. St. Rep. 285, 31 So. 671; *Harrigan* v. *Gilchrist* (1904), 121 Wis. 383, 99 N. W. 909; *Tracy* v. *Tracy* (1901), 62 N. J. Eq. 807, 48 Atl. 533; *Kelly* v. *Jones,* 290 Ill. 375, 125 N. E. 334, cited above; *Stewart* v. *Coleman & Co.,* 81 So. 653. In the case of *Railroad Co.* v. *Jackson,* 92 Miss. 517, 46 So. 142, tried before a jury, WHITFIELD, C. J., said: "Juries cannot arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case." We take it that the above principle is equally applicable to a court of conscience.

*Percy & Percy,* for appellee.

Counsel for appellant in their brief filed herein confine their argument to the single point that a court cannot disregard the uncontradicted evidence of a witness and cited a number of cases in support of their position. Without burdening the court with an extensive statement from each case cited, showing the ground upon which the courts predicated their decisions, the court will note from the citations of the various cases that each court holds that in order to justify the rejection of evidence it must be either contradictory or improbable in itself, or inherently improbable, or inconsistently improbable, or uncontradicted by circumstances. No case can be found in which the courts have held that solely because a witness is uncontradicted by another witness that the trial court must believe the evidence of the witness and base its decision accordingly. There is no such hard and fast rule. If controverted testimony of a witness is inherently improbable, inconsistent with circumstances, or somewhat contradictory in itself, the court may disregard the testimony of such witness, especially where the witness is an interested party. See 23 Corpus Juris, pages 57-8.

The chancellor, observing the demeanor of the witness and having the benefit of hearing the testimony as delivered by the witness, noting the inconsistency in and improbability of the witness' testimony, came to the conclusion that the appellant, though uncontradicted, had not made out a case against appellee. Wilson's testimony is inherently improbable, is inconsistent with all the circumstances in evidence, is contradictory in itself, and taking these factors into consideration, particularly in view of the fact that the appellant was the witness, the chancellor was justified in entering the decree in favor of the defendant. It was needless to go on and merely have the appellant contradicted by another witness. It was not necessary. He contradicted himself and all the circumstances shown to have been incident to the arrangement between the parties for 1917, having existed during the year 1918. A charge only in the mind of the appellant, brought to light solely because the appellee made a profit from the operation of the plantation during the year 1918. If there were the slightest probability of the appellant being entitled to receive any part of the profits for the year 1918, such profits being shown to have been six thousand dollars, would the appellant have consented to accept his own note for three hundred fifteen dollars for his part of the profits, or would the appellee have declined to have cancelled such note for the assignment of such interest?

We submit the decree of the chancellor was correct and the case should be affirmed.

ETHRIDGE, J., delivered the opinion of the court.

The appellant and the appellee entered into a partnership in the fall of 1916 for running a general business, embracing planting, merchandising, etc., and leased a plantation for a period of five years and engaged in the mercantile business. For the year 1917 it was agreed that the defendant Blanton would finance the farming operations individually and would take the entire profits or suffer the losses resulting therefrom. The complainant filed his bill for an accounting of the partnership for the year 1918 as

regards the planting operations; the complainant and the defendant having settled the mercantile business and divided the plantation, and dissolving the partnership in the year 1919. The complainant alleged in paragraph 3 of the bill:

"That complainant accepted the last-mentioned proposition, entered unreservedly into the arrangement, and did diligently apply himself to operating and promoting the ends of the special 1917 partnership, and that with the advice and consent of his partner, the defendant, he considerably increased the stock of goods in the merchandising business, by re-investing the profits in additional new stock, while defendant, according to the last-mentioned plan, took over for said year 1917 and did operate the plantation and pay the rent as agreed upon, and at the close of said year, the business of which was apparently satisfactory to both parties, they, as agreed, returned to the original entire partnership contract; defendant, Blanton, continuing to look after the planting and outside work, while complainant continued to supervise and handle the merchandise end of the business and collateral matters."

The defendant answered this paragraph as follows:

"Some time in January or February, 1918, complainant and defendant agreed to continue the partnership under the modifications entered into for the year 1918. The defendant was to operate and cultivate the leased lands, and complainant was to look after the mercantile end of the partnership. Under the arrangement made for the year 1918, the defendant was to pay the rent of one thousand five hundred dollars a year, and the complainant was to occupy free of rental the dwelling on the premises and a store building on a separate tract of land. Under the arrangement entered into for the year 1918, the defendant was to operate the leased lands, and was to retain all profits derived from the planting operations. Defendant denies that the complainant considerably increased the stock of goods in the mercantile business by reinvesting the profits, and denies that the parties, subsequent to the

year 1917 and for the year 1918, returned to the original entire partnership agreement."

It was alleged in the bill that the defendant did not operate the plantation at a loss during the year 1918, but that, on the contrary, the planting adventure and the purchase and sale of cotton for that year netted nearly seven thousand dollars, alleging the landlord's part or share of the cotton and various and sundry items of the operation of the plantation for that year. The defendant in his answer admitted making above expenses about six thousand dollars. The defendant denied that the partnership covered operations for buying for resale of cotton, and denied that the complainant was entitled to any interest in the profits made by the defendant in buying and selling cotton, and denied that the defendant was entitled to an accounting or to any relief; also denied ability to file an account, because he had kept no books, and was unable therefore to produce any books or to account.

The complainant introduced two witnesses. One was the cashier of the Bank of Leland for the years 1917 and 1918, who testified that Mr. Wilson and Mr. Blanton came to him to discuss their business, and wanted him to draw some contracts, one for a division of the leased plantation, and the other for a settlement of the mercantile business, which papers he drew, and which were introduced in evidence by the complainant. His testimony was that nothing was said by the parties, together or in the presence of each other, as to farming operations for 1918, but that Wilson told him privately that he did not want to embrace that in the contract of settlement, as he had an attorney handling that part of the proposition. Neither of the contracts drawn, introduced in evidence, mentioned the farming operations for the year 1918. When this witness was being examined by the defendant, he was being questioned as to whether Wilson did his banking business with him, and if Wilson ever put any money in the planting business, when counsel for the complainant made the following statement:

"We admit that he never put out a nickel for the 1917 and 1918 crop; that the entire amount used in the working, gathering, and marketing of the crop was advanced by Sam Blanton."

Mr. Wilson, the complainant, testified that he came to Arcola in July, 1916, and was in a partnership with a Mr. Harrison; that in the fall he found out they could lease the Joe Smith place, which is the place referred to above, and that he and Blanton entered into a partnership arrangement, leasing the place, and that Blanton bought out Mr. Harrison's interest in the mercantile business, and that Wilson was to look after the store, and that Blanton was to look after the plantation; that they agreed for the year 1917 Blanton would finance the farming operations, and have the entire profits, and bear the losses thereof; that at the end of 1917 Blanton was to come back to the store, and Wilson to look after the farming interest from then on for the last four years; that Blanton agreed to furnish or lend Wilson money, and that he put in five hundred dollars, taking Wilson's note for one-half thereof, to increase the store business above the amount they had started with; that this partnership was to last five years; that in 1917 Blanton did operate the farm and furnish the same on his own account; that along in December, 1917, Wilson asked Blanton what he was going to put the corn, mules, and plow tools in at for the next year, the same being the property then of Blanton. Blanton stated that he would put the corn in at one dollar and seventy-five cents per bushel. Wilson thought that too much, and he asked Blanton if he was still going to lend him his part of the money to run the place, and Blanton said:

" 'No; I am making more than six per cent.,' and he (Wilson) told him, whenever he got ready to pay the rent, to 'let me know; I have the money ready;' and he wanted to know where I would get it, and I told him, of course I would have to borrow it, as that was all the way I had to get it, and he said he would be damned if he would farm on borrowed capital. So things rocked on. The next day

he wanted a new note. I made out a new note, which represented the one-half of the five hundred dollars which Blanton had put in the business."

He further testified that Blanton never asked him for any money to assist in furnishing the plantation; that he supposed that Blanton was going to furnish it to him in accordance with the original agreement, in view of what he said about borrowed money for farming operations; that in the fall of 1918 Wilson began to inquire as to what Blanton was getting for the cotton, and that Blanton invariably put him off; that in January, 1919, Blanton wanted to take stock of the assets in the store, and that Wilson stated that he wanted to close it all out when he did any closing out at all; that he wanted to close up the farming and all, and have a settlement all the way round, and that Blanton said, "No;" he was not going to do that; he wanted to settle the store business; so the witness came to see his attorney as to whether or not he could make a separate settlement as to the store and was advised that he could and that he returned home; that Blanton would make one proposition one day and another the next, and finally gave a give or take proposition of one thousand seven hundred dollars and his account at the store, or would give Wilson one thousand seven hundred dollars and Wilson's account at the store, and gave him twenty-four hours to decide the proposition; that the store inventoried seven thousand dollars, and that he arranged with the Bank of Leland to get the money to buy out Blanton's interest in the store; that he told Blanton he wanted to settle the plantation business also, and asked him if he would give the note for three hundred fifteen dollars in settlement of the place, and Blanton said he would, but told him to wait a day or so; that when they went to Crosby at the bank, to fix up the papers, Blanton declined to give up the note of three hundred and fifteen dollars in settlement of the plantation matter, and that they then tore up the contract, and that Wilson sold to Blanton his half interest in the store for one thousand seven hundred dollars; that his reason

for offering to take three hundred fifteen dollars for his interest in the plantation profit for the year 1918 was that he wanted to buy the store, as it was profitable, and that he did not have any books of account against Blanton; that the deal between him and Blanton, drawn up at the Bank of Leland, only embraced the mercantile business and the division of the land for the future part of the lease.

The chancellor, at the conclusion of the complainant's evidence, dismissed the complainant's bill. The record does not show whether the defendant rested on the complainant's case or not, but in the brief of the appellee it is stated that the chancellor declined to hear evidence from defendant, as in the court's opinion complainant had not made out a case. It will be noted from the above statement that the defendant admits a partnership agreement entered into in 1916 for five years. It also admits the allegation of the bill as to the contract for the year of 1917. The answer of the defendant sets up affirmatively that there was a contract for the year 1918 also as for the year 1917. This is an affirmative allegation in the answer. The complainant's testimony above set out shows that there was no contract for the year 1918 under which the defendant was to have the plantation, or that the agreement of 1917 was to be continued for 1918.

The complainant testified that the agreement was that the general partnership was to be resumed in 1918. He also testifies that a settlement of this partnership for 1918 was not included in the settlement. The only evidence being that the complainant did not furnish any part of the money for the farming operations for 1918, but he testifies that he was never called on so to do, and that he supposed that Blanton was carrying out the original agreement to furnish him the money at six per cent. It is true he testifies that Blanton in one place said he would not do that, but after telling Blanton that he would borrow the money, and Blanton's objecting to his doing so, he assumed Blanton was going ahead with the original arrangement, as he never asked him for the money.

We think, taking this testimony in connection with the admissions in the answer, that the evidence was sufficient to make out complainant's case to the extent of the farming operations. The answer admitted that six thousand dollars profit was made therefrom for said year. It is argued here that the chancellor is the judge of the credibility and weight of the testimony, and that he observed the witnesses testifying, and that he was under no compulsion to accept their statements as being true. The rule is that the testimony of a witness which is uncontradicted, and who is not impeached in some manner known to the law, where he is not contradicted by the circumstances, must be accepted as true. It is true that the direct evidence of a witness may be contradicted by circumstances, but in such case the circumstances relied on for contradiction must be inconsistent with the truth of the testimony. "When the testimony of a witness is not contradicted, either by direct evidence or by circumstances, it must be taken as true." *Stewart* v. *Coleman*, 120 Miss. 28, 81 So. 653. This court has so held in many cases, and we hold that neither the chancellor nor a jury have an arbitrary right to disregard testimony, which is neither inconsistent with the laws of nature, and which is not contradicted either by direct or circumstantial evidence. The presumption is that men testify truthfully, and such testimony cannot be destroyed arbitrarily. There must be some legal reason for disregarding testimony. The mere fact that a trier of fact does not like the looks of a witness is not alone sufficient. Of course, where there is a conflict, the appearances of the witnesses have a material bearing on the probabilities of the case. Therefore the judgment of the court below will be reversed, and the cause will be remanded for a new trial.

*Reversed and remanded.*